IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL ACTION NO. 3:22-CV-00138-SCR

| | |
|---|---|
| **FRONT ROW MOTORSPORTS, INC.** and **ROBERT A. JENKINS,** | )<br>)<br>) |
| **Plaintiffs,** | )<br>) |
| v. | )     **MEMORANDUM AND ORDER** |
| **MICHAEL D. DISEVERIA** and **RONALD C. DEVINE,** | )<br>)<br>)<br>) |
| **Defendants.** | )<br>) |

**THIS MATTER** is before the Court on a "Motion for Summary Judgment" submitted by Plaintiffs Front Row Motorsports, Inc., and Jenkins (Doc. No. 31) and a "Motion for Summary Judgment" submitted by Defendants Michael D. DiSeveria and Ronald C. Devine (Doc. No. 27), as well as the parties' associated briefs and exhibits. (Doc. Nos. 27-29, 32-34, 37-40, 42-44, 47-50 & 52-53).

The parties have consented to Magistrate Judge jurisdiction pursuant to 29 U.S.C. § 636(c). These motions are now ripe for the Court's consideration. After fully considering the arguments, the record, and the applicable authority, the Court grants in part Plaintiffs' Motion and denies Defendants' Motion.

I. **FACTUAL AND PROCEDURAL BACKGROUND**

The parties do not dispute that in February 2016, NASCAR began a "charter system" and granted two Charter Member Agreements ("CMA") to BK Racing, LLC ("BK Racing"), which were CMAs 32 and 33. (Doc. Nos. 1 at ¶¶15-21 & 28 at 3). Defendants DiSeveria and Devine and

1

non-party Wayne Press were principals of entities with membership interests in BK Racing. (Doc. Nos. 29-4 at 60, 61, 75, 29-14 at 3, 34-3, & 34-5).

On or around May 31, 2016, BK Racing signed a Commercial Security Agreement with Union Bank & Trust (together with successor in interest, Atlantic Union Bank, "the Bank") that granted the Bank "a security interest in the Collateral," which is defined as "all of [BK Racing's] rights, title, and interest, . . . in all assets of every kind and nature, including but not limited to . . . [a]ll of [BK Racing's] rights, title and interest in that certain NASCAR Cup Series Charter Member Agreement, relating to assigned car number 83. . .". Commercial Security Agreement (Doc. No. 29-1 at 38).[1] The Bank filed a UCC-1 Financing Statement based on the Commercial Security Agreement. (Doc. No. 33-3 at 4).

In December 2016, BK Racing entered into a Charter Purchase Agreement to sell CMA 33 to Front Row for $2 million. (Doc. Nos. 29-6, 33 at ¶ 11, & 33-1). Plaintiff Jenkins avers that the CMA 33 was "assigned car number 83" based on specific language in the charter and that the parties had referred to CMA 32 and CMA 33 as the "number 23" and "number 83" charters, respectively. (Doc. No. 33 at ¶ 19). Devine signed the Purchase Agreement in three separate capacities: as President, Team Owner, and Control Person of BK Racing. (Doc. Nos. 29-6 & 33-1 at 7). Neither BK Racing nor Devine informed Front Row of the security interest at that time, although they agreed to sell CMA 33 "free and clear of all liens, encumbrances, mortgages or other claims. . . ." (Doc. Nos. 29-6 at 3, 33 at ¶¶ 8-11, 13, 18, & 33-1 at 3). The Purchase Agreement included an Indemnification provision that stated:

> The Seller shall indemnify and hold harmless the Buyer and its affiliates (and the officers, directors, managers, members, employees and agents of each of them) any

---

[1] Courts may take judicial notice of state court filings. Sun Chems. Trading Corp. v. CBP Res., Inc., No. 1:01CV00425, 2004 U.S. Dist. LEXIS 15460 (M.D.N.C. June 3, 2004); see also Fed. R. Evid. 201(b).

2

and all damages, losses, liabilities, claims, and expenses (including reasonable attorneys' fees) arising, directly or indirectly, from or in connection with: (i) any breach or alleged breach of any representation or warranty of the Seller contained in this Agreement or in any agreement or instrument executed and delivered pursuant to this Agreement, (ii) any breach or alleged breach of any covenant or agreement of the Seller contained in this Agreement or in any agreement or instrument executed and delivered pursuant to this Agreement, and (iii) any Excluded Liability. Upon notice to the Seller specifying in reasonable detail the basis for such set-off, the Buyer may set off any amount to which it hereunder to the Seller, including the amounts owed pursuant to the Service Agreement. The exercise of such right of set-off by the Buyer hereunder in good faith shall be deemed not to constitute a breach of this Agreement or any other covenant or obligations of the Buyer. Neither the exercise of nor failure to exercise such right of set-off shall constitute an election of remedies or limit the Buyer in any manner in the enforcement of any other remedies that may be available to it.

(Doc. Nos. 29-6 at 4 & 33-1 at 5). Front Row paid $1 million to BK Racing for the transfer of the charter in December 2016, with the remaining $1 million to be delivered on January 9, 2017, provided certain conditions were met. (Doc. No. 33 at ¶ 11, 33-1 at 3, & 33-2). This included that BK Racing's representations in the Purchase Agreement were accurate, BK Racing performed or complied with all of its obligations, delivered a certificate certifying Front Row's ownership of CMA 33, delivered a certificate of existence of the Team Owner, delivered a certificate as to the tax good standing status of the Team Owner, and NASCAR consented in writing to the transfer of the Charter from BK Racing to Front Row. (Doc. No. 33-1 at 4). When Front Row discovered the security interest in CMA 33 on or around December 23, 2016, it refused to pay the remaining $1 million. (Doc. No. 33 at ¶ 15-22).

In January 2017, following discussions of the security interest and its applicability to CMA 33, Front Row agreed to pay the remaining sum if the principals signed an Indemnity Agreement. (Doc. No. 33 at ¶ 23-25). Both Devine and DiSeveria signed, but non-party Press refused. (Id. at ¶26-27 & Doc. No. 33-4 at 10). Relying on Devine and DiSeveria's agreement to indemnify, Front Row paid the second $1 million. (Doc. No. 33 at ¶27-29).

3

The Indemnity Agreement reads:

> Ronald C. Devine, Michael DiSeveria, and Wayne M. D. Press, all officers, Members or control persons of BK Racing, LLC hereby fully indemnify and agree, each in his individual capacity, to jointly and severally defend and hold harmless Robert A. Jenkins and Front Row Motorsports, Inc., its officers, directors, partners, agents and employees from and against any claims, liabilities, suits, proceedings, causes of action, or damages of any kind, whether in contract, tort or otherwise, that arise from or relate to claims by any and all third parties against one or both Indemnitees arising from or relate to [*sic*] claims by any and all third parties against one or both Indemnitees arising from or related to (a) the December 06, 2016 sale and transfer by BK Racing, LLC to Front Row Motorsports, Inc. of a NASCAR Cup Series Charter (number 33) Member Agreement; (b) any security agreements or financing statements seeking to be enforce [*sic*] against the Charter by any person or entity; (c) any person or entity claiming any interest, whether perfected or not, in the Charter; and (d) any judgment awards being levied against the Charter by any person or entity. The Indemnitors shall pay claims and losses in connection with the [*sic*] all of the foregoing and shall investigate and defend all claims, suits, or actions of any kind or nature, including appellate proceedings in the name of the applicable indemnified party, and shall pay all costs and judgments and attorney's fees which may issue thereon.

(Doc. No. 33-5 at 2-3).

The Indemnity Agreement contains no statement or other indication that it would only be enforceable upon execution by all three individuals: Devine, DiSeveria, and Press. Nor is there any evidence that prior to execution there were communications among the parties to that effect.

The Indemnity Agreement also contains a merger clause entitled "Final Agreement," which states:

> This Indemnity represents the final agreement between [the parties] and may not be contradicted by evidence of prior, contemporaneous or subsequent oral agreements. Indemnitors covenant and agrees [*sic*] that there are no unwritten oral agreements between [the parties] and all prior or contemporaneous agreements, understandings, representations and statements, oral or written, are merged into this Indemnity….

(Doc. No. 33-5 at 6).

Finally, the Indemnity Agreement contains a choice of law provision entitled "Governing Law," which states "[t]his Indemnity is delivered in the State of North Carolina, and it is the intent

4

of Indemnitors and Indemnitees that this Indemnity shall be deemed to be a contract made under and governed by the internal laws of the State of North Carolina, without regard to its principles of conflicts of law." (Doc. No. 33-5 at 5).

Defendants' then-counsel urged in-house counsel at Front Row to proceed with only Devine's and DiSeveria's agreement. (Doc. Nos. 32 at 20 & 33-4 at 5-7). Specifically, BK Racing's counsel, Adam Ross, sent an email to Plaintiffs asking Front Row's in-house counsel to "please confirm that . . . your clients will accept the indemnity agreement with [Devine's] and [DiSeveria's] signatures and wire the balance of the $1,000,000 to [BK Racing] today." (Doc. No. 32 at 20 & 33-4 at 5). This email followed an earlier email from BK Racing's counsel to Front Row's counsel wherein he wrote "our clients have a dispute over $1,000,000 which [BK Racing] needs to operate or risks going out of business. Or, Mr. Jenkins and his company can accept the indemnification agreement signed by [Devine] and [DiSeveria] (which goes far beyond the deal I originally contemplated) and should provide more than adequate assurance that they are protected in the incredibly unlikely event of some sort of claim against the charter." (Doc. Nos. 32 at 20 & 33-4 at 7).

Nevertheless, at his deposition, DiSeveria testified that he did not learn that Press had not signed the Indemnity Agreement until after the Virginia lawsuit was filed, discussed below. (Doc. No. 44-1, Exhibit F at 29:13-30:15). DiSeveria argues that the Indemnity Agreement is unenforceable as to him because Plaintiffs "offer no evidence that [he] assented to Press's absence" and that the "only intent he ever manifested, based upon his deposition testimony, was to sign as one of three indemnitors, ultimately responsible for one-third of any required indemnity." (Doc. No. 42 at 12). In other words, DiSeveria held an uncommunicated, undocumented subjective belief that he would only be liable if Press also signed the Indemnity Agreement.

5

In October 2017, the Bank informed Front Row that it intended to enforce its security interest. (Doc. No. 33 at ¶37). Defendants contend that a potential buyer offered $2.75 million for the charter. (Doc. No. 29-1 at 29, ¶¶45-46). In a November 27, 2017 letter, NASCAR prohibited the sale because there was "legal uncertainty regarding the rights, title, and interest in and to CMA #33." (Doc. No. 29-1 at 29, ¶¶ 45-46 and 29-10 at 1). Thereafter, Plaintiffs made their first written demand for indemnification to Defendants, stating that they were required to "immediately take any and all actions necessary to address and fully resolve the claims and actions asserted by [the Bank] with respect to [CMA 33]." (Doc. No. 33-6 at 3).

The Bank filed suit against BK Racing[2] and Front Row, and Plaintiffs made further written demands for indemnification.[3] (Doc. Nos. 33-7, 33-8, & 33-10). The Bank requested $8.6 million in damages and sought an order voiding and setting aside the Purchase Agreement and granting the Bank immediate possession of CMA 33. (Doc. No. 33-7 at 24-28). The primary claim was breach of contract, but the Bank also sued for fraudulent conveyance, tortious interference, and business conspiracy, all of which were later grouped under the general title "Other Claims." Id.

In March 2022, Plaintiffs settled the Bank's Virginia lawsuit for $2.1 million. (Doc. No. 34-12). At the time of settlement, the Bank continued to claim a perfected security interest in CMA 33 based on the Collateral Description in the Security Agreement and Financing Statement. (Doc. No. 33 at ¶46). The Bank claimed the total payoff of the loans secured by CMA 33 was $12,112,307.49. (Doc. No. 34-9 at ¶47). Devine valued CMA 33 at more than $12 million. (Doc.

---

[2] On February 15, 2018, BK Racing filed a bankruptcy petition in the United States Bankruptcy Court for the Western District of North Carolina. In re BK Racing, LLC, Case No. 18-30241 (Bankr. W.D.N.C.).

[3] The Bank filed its first suit in North Carolina but dismissed it without prejudice and proceeded in Virginia. (Doc. Nos. 34-6 & 34-7).

6

No. 34-10 at 12-13). Although there is no dispute that Defendants had notice of the lawsuit and ultimate settlement, Defendants opted not to participate in the negotiations. (Doc. Nos. 33 at ¶44 & 34-12). Plaintiffs served a "Final Demand and Notice of Obligations Under Indemnity and Hold Harmless Agreement" demanding indemnification for Plaintiffs' defense and expenses related to the Bank's lawsuit. (Doc. No. 33-10). Plaintiffs' total in legal fees and costs was $412,397.48. (Doc. No. 33 at ¶55).

On April 1, 2022, Plaintiffs filed this action, stating a single claim for breach of contract, that is, the Indemnity Agreement, and seeking to recover the amount of the settlement plus their legal fees and costs, totaling $2,512,397.48. (Doc. Nos. 1 & 32 at 13).

On July 15, 2022, Defendants filed their Answer, Affirmative Defenses and Counterclaim. (Doc. No. 14). In their Counterclaim, Defendants seek a Declaratory Judgment that the Indemnity Agreement is unenforceable, and that they have no liability to Plaintiffs. (Id. at 16, 27).

The parties' cross-Motions for Summary Judgment have been fully briefed and are ripe for disposition.

## II. ANAYLSIS

### A. Standard of Review

Rule 56(a) of the Federal Rules of Civil Procedure provides:

> A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on record the reasons for granting or denying the motion.

Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are

irrelevant or unnecessary will not be counted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The party seeking summary judgment bears "the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255 (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–159 (1970)). The court applies "the fundamental principle that at the summary judgment stage, reasonable inferences should be drawn in favor of the non-moving party." Jacobs v. N.C. Admin. Off. of the Cts., 780 F.3d 562, 570 (4th Cir. 2015) (quoting Tolan v. Cotton, 572 U.S. 650, 660 (2014)).

"Summary judgment cannot be granted merely because the court believes that the movant will prevail if the action is tried on the merits." Id. at 568 (quoting 10A Charles Alan Wright & Arthur R. Miller et al., Federal Practice & Procedure § 2728 (3d ed. 1998)). "The court therefore cannot weigh the evidence or make credibility determinations." Id. at 569 (citing Mercantile Peninsula Bank v. French (In re French), 499 F.3d 345, 352 (4th Cir. 2007)). The question posed by summary judgment is whether the evidence "is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 252.

**B. Breach of Valid and Enforceable Indemnity Agreement**

Plaintiffs allege Defendants' breach of contract and failure to indemnify is sufficient to establish grounds for summary judgment. (Doc. No. 31). They argue the Indemnity Agreement

is a valid contract, as the terms are unambiguous, both Defendants signed it, and the plain language details the offer, consideration, and acceptance required for a valid contract. (Doc. No. 32 at 11).

The parties do not dispute that North Carolina law applies. To prevail on a breach of contract claim, a party must establish: (1) the existence of a valid contract; and (2) breach of the terms of that contract. One Beacon Ins. Co. v. United Mech. Corp., 700 S.E.2d 121, 124 (N.C. Ct. App. 2010).

Defendants further do not dispute that they signed the Indemnity Agreement. Based on the plain language in the Indemnity Agreement, Defendants agreed to:

> [Defendants] all officers, Members or control persons of BK Racing, LLC hereby fully indemnify and agree, each in his individual capacity, to jointly and severally defend and hold harmless Robert A. Jenkins and Front Row Motorsports, Inc., its officers, directors, partners, agents and employees from and against any claims, liabilities, suits, proceedings, causes of action, or damages of any kind, whether in contract, tort or otherwise, that arise from or relate to claims by any and all third parties against one or both Indemnitees arising from or relate to [*sic*] claims by any and all third parties against one or both Indemnitees arising from or related to (a) the December 06, 2016 sale and transfer by BK Racing, LLC to Front Row Motorsports, Inc. of a NASCAR Cup Series Charter (number 33) Member Agreement; (b) any security agreements or financing statements seeking to be enforce [*sic*] against the Charter by any person or entity; (c) any person or entity claiming any interest, whether perfected or not, in the Charter; and (d) any judgment awards being levied against the Charter by any person or entity. The Indemnitors shall pay claims and losses in connection with the [*sic*] all of the foregoing and shall investigate and defend all claims, suits, or actions of any kind or nature, including appellate proceedings in the name of the applicable indemnified party, and shall pay all costs and judgments and attorney's fees which may issue thereon.

(Doc. No. 33-5 at 2-3).

"When an indemnitee seeks to be indemnified after a settlement with a third party, its burden depends on the notice given to the indemnitor. An indemnitor that receives adequate notice of the underlying third-party claim and an opportunity to be heard is bound by a reasonable, good-faith settlement of that claim so long as the indemnitee can show potential liability." Banc of Am. Merch. Servs., LLC v. Arby's Rest. Grp., Inc., No. 20 CVS 426, 2021 NCBC LEXIS 61, at *25

9

(N.C. Super. Ct. June 30, 2021) (relying on Kirkpatrick & Assocs., Inc. v. Wickes Corp., 53 N.C. App. 306, 311 (1981)). Here, there is no dispute that Plaintiff provided adequate notice to Defendants of claims made by the Bank, and Defendants had opportunities to defend in that litigation. Rather, Defendants advance several other arguments as to why the Indemnity Agreement is unenforceable.

One of Defendants' arguments is that the Indemnity Agreement is unenforceable because DiSeveria had a belief that he would not be liable unless Press also signed. (Doc. No. 42 at 12 and 44-1, Exhibit F at 29:13-30:15). In North Carolina, however, mere subjective belief coupled with apparent acquiescence is insufficient.

In Parker, the North Carolina Court of Appeals held that a contract containing a written provision conditioning enforceability on the communication of a fully executed copy to both parties was unenforceable, because although both a husband and wife were identified as sellers, the wife did not sign the contract. See Parker v. Glosson, 182 N.C. App. 229, 232 (2007) ("[I]f negotiating parties impose a condition precedent on the effectiveness of their agreement, no contract is formed until the condition is met"). Parties may impose a condition that the agreement is not to be binding until signed by others, but that requirement must be affirmatively established before signing. Id. at 233–34 (citing Hilliard v. Thompson, 81 N.C. App. 404, 409 (1986) (Whichard, J., concurring and stating the majority holding) (concluding because "[t]he uncontroverted forecast of evidence . . . establishes that defendant manifested an intent that the alleged agreement was not to be binding unless his wife became a party by agreeing to it, and that his wife refused to sign and become a party. . . . I would hold that the plaintiffs cannot enforce the alleged agreement.")).

In Hilliard, the Court held:

> [T]he instrument [was] void [because] it was intended that all the parties should execute it and that each executes it on the implied condition that it is to be executed by the others, and, therefore, that until executed by all it is inchoate and incomplete and never takes effect as a valid contract, and <u>this is especially true where the agreement expressly provides or its manifest intent is, that it is not to be binding until signed</u>.

Hilliard, 81 N.C. App. at 408 (emphasis added).[4]

However, courts have declined to extend these holdings to facts where the contract did not contain a provision that it must be signed by all parties to be enforceable or other circumstances showing an unambiguous agreement between the parties that a condition precedent must be met before a contract was formed. See, e.g., Red Apple Dev., LLC v. Rufus Rd. Partners, LLC, No. 3:19-CV-00157-GCM-DCK, 2022 WL 567844, at *4 (W.D.N.C. Feb. 24, 2022) (in North Carolina, "[c]onditions precedent are not favored by the law. Thus, the provisions of a contract will not be construed as conditions precedent in the absence of language clearly requiring such construction.") (distinguishing Parker among others); Castro v. Goggins, No. 1:16-CV-10, 2016 WL 4508349, at *5 (M.D.N.C. Aug. 26, 2016) (distinguishing Parker).

Here, there was neither an express, written condition precedent in the Indemnity Agreement nor were there any communications to this effect. In fact, the opposite is true because the signers agreed to "fully indemnify and agree, <u>each</u> in his individual capacity, <u>to jointly and severally</u> defend and hold harmless [Plaintiff]. . . ." (Doc. No. 1-1 at 1-2) (emphasis added). The Indemnity Agreement also provides that the "Indemnitors shall be liable for the Obligations in accordance with their terms notwithstanding any lack of authorization or defect in execution or delivery by Indemnitors." (Doc. No. 1-1 at 3). The Court is bound by the language of the Indemnity Agreement, not the parties' subjective intent. Defendant DiSeveria's uncommunicated,

---

[4] Because Judge Johnson joined in Judge Whichard's concurrence, the majority holding is contained in the concurrence. Parker, 182 N.C. App at 232 n.1.

11

subjective belief that Press would also sign the Indemnity Agreement and that his liability depended on Press's participation is insufficient as a matter of law.

The Court further observes that the Indemnity Agreement contained a merger clause. "Merger clauses create a rebuttable presumption that the writing represents the final agreement between the parties." Marwan Elhulu; Khalid Alnabulsi; & Mohammed Saqqa, Plaintiffs, v. Fadel Alshalabi; & Omni Holding Group, LLC, Defendants., No. 20 CVS 12827, 2021 WL 4888283, at *3 (N.C. Super. Oct. 19, 2021) (quoting Zinn v. Walker, 87 N.C. App. 325, 333, 361 S.E.2d 314 (1987)). Evidence of fraud, bad faith, and similar malfeasance may rebut the presumption. Id. Defendants have made no showing of fraud, bad faith, or other malfeasance.

However, Defendants have submitted a public policy argument urging the Court to find the Indemnity Agreement unenforceable because one of the underlying claims in the Bank case in Virginia was, according to Defendants, premised on a criminal statute, Virginia's business conspiracy statute, VA. CODE ANN. § 18.2-499,-500. Defendants rely on Graham v. James F. Jackson Associates, Inc., 352 S.E. 2d 878, 881 (1987) and Lewis v. Dunn Leasing Corp., 244 S.E. 2d 706, 709 (1978) for the proposition that an insurance policy is void if its intent is to indemnify the insured against liability for his criminal acts. While a creative argument, the Court finds the Defendants' position unpersuasive as applied to the instant case. The Bank case in Virginia was a civil lawsuit and sought various claims related to a security interest and loans held. Here, Defendants agreed to indemnify claims, signed such an agreement with knowledge of the Bank's security interest and Plaintiffs' concern about potential claims. Now, Defendants seek to avoid such indemnity. Graham and Lewis did not address these circumstances.

Defendants also argue that the Indemnity Agreement is unenforceable because Front Row did not provide any consideration. This argument fails as a matter of law. See Snyder v. Freeman,

12

266 S.E.2d 593, 602 (N.C. 1980); Continental Cas. Co. v. Funderburg, 140 S.E.2d 750, 752 (N.C. 1965); Myers v. Allsbrook, 51 S.E.2d 629, 631 (N.C. 1949). Based on the plain language of the Indemnity Agreement, there are reciprocal promises wherein Front Row agreed to forgo its Setoff Rights under the Purchase Agreement and issue Payment #2 in exchange for Defendants' promise of indemnity. Front Row made Payment #2 to Defendants, and there has been no allegation to the contrary. While the payment alone is consideration, a promise to forbear the exercise of a legal right also is sufficient consideration. Snyder, 266 S.E.2d at 602; Myers, 51 S.E.2d at 631.

Concerning Plaintiff's Motion for Summary Judgment on its breach of contract claim, and taking all facts in the light most favorable to the Defendants, the Court finds there is no genuine issue of material fact as to the validity, enforceability, and breach of the Indemnity Agreement. As a matter of law and based on the undisputed facts, the Indemnity Agreement is valid and enforceable, and Defendants breached the Indemnity Agreement by refusing to indemnify Plaintiffs. Accordingly, Plaintiff is granted Summary Judgment on the issues of the validity, enforceability, and breach of the Indemnity Agreement. Defendants' Counterclaim for a Declaratory Judgment that the Indemnity Agreement is unenforceable is dismissed. For the same reasons, Defendants' Motion for Summary Judgment is denied as to the same issues.

### C. Reasonableness is a Question for the Fact Finder

The analysis now turns to the question to what extent Defendants are liable to Plaintiffs for the settlement of the Virginia lawsuit, which in turn rests upon whether the settlement was reasonable under the circumstances.[5] Banc of Am. Merc. Servs., LLC, 2021 NCBC LEXIS at *25; see also US Foods, Inc. v. White Oak Manor-Charlotte, Inc., 3:19-cv-00227-RJC-DCK, 2021 U.S.

---

[5] The parties do not dispute that Defendants had notice of the Virginia lawsuit. Defendants' brief in opposition to Plaintiff's Motion argues only the reasonableness of the settlement and submits several defenses on this point. (Doc. No. 42 at 7-11).

13

Dist. LEXIS 124930 (W.D.N.C. July 2, 2021) (granting plaintiff indemnitee summary judgment following underlying litigation where third-party defendant indemnitor did not participate in the suit or settlement but was bound by a preexisting indemnity agreement).

The Court is mindful, however, that in most circumstances reasonableness is a question for the fact finder, a position the Court does not yet stand in at this stage in the proceedings. See, e.g., Fortson v. Garrison Prop. and Cas. Ins. Co., No. 1:19-CV-294, 2022 WL 198782, at *10 n.9 (M.D.N.C. Jan. 13, 2022) (noting that "North Carolina courts hold that 'reasonableness' is usually a factual issue for the jury in many different types of cases") (collecting cases); Bader v. Roberts & Stevens, P.A., No. 1:16-CV-00294-GCM-DSC, 2018 WL 4760500, at *3 (W.D.N.C. Oct. 2, 2018), aff'd sub nom. Bader v. Kurdys, 767 F. App'x 516 (4th Cir. 2019) ("Reasonableness of a party's reliance is ordinarily a jury question unless the facts would allow a reasonable jury to make only one decision") (citing MacFadden v. Louf, 182 N.C. App. 745, 748 (2007)); Team Gordon, Inc. v. Fruit of the Loom, Inc., No. 3:06-CV-201-RJC, 2009 WL 426555, at *6 (W.D.N.C. Feb. 19, 2009) (reasonableness "is a jury question except in the clearest cases," concluding that reasonableness of Plaintiff's mitigation efforts was for the jury) (citing Radford v. Norris, 63 N.C. App. 501, 503 (1983)).

Applying these legal principles to the record here, the Court finds that there are genuine issues of material fact as to the reasonableness of the underlying settlement. Without forecasting any outcome, the Court will resolve these factual issues, including arguments and defenses as to whether the settlement was reasonable, at the bench trial that the parties have requested. The parties are cautioned, however, that the Court will not permit the parties to litigate the underlying Bank action. Accordingly, the parties' Motions for Summary Judgment are <u>denied</u> as to the issue of reasonableness of the settlement and the amount of ensuing damages.

### III. ORDER

**NOW THEREFORE IT IS ORDERED** that:

1. Plaintiffs' "Motion for Summary Judgment" (Doc. No. 31) is **GRANTED IN PART** and **DENIED IN PART.** Specifically, Plaintiffs Motion is **GRANTED** as to the validity, enforceability, and breach of the Indemnity Agreement and **DENIED** in all other respects. Defendants' Counterclaim for a Declaratory Judgment that the Indemnity Agreement is unenforceable is **DISMISSED WITH PREJUDICE**.

2. Defendants' "Motion for Summary Judgment" (Doc. No. 27) is **DENIED**.

3. The parties are encouraged to resume settlement negotiations and consider whether a judicial settlement conference would be helpful.

4. The Clerk is directed to send copies of this Memorandum and Order to counsel for the parties.

**SO ORDERED.**

Signed: August 29, 2023

_____
Susan C. Rodriguez
United States Magistrate Judge