IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL ACTION NO. 3:22-CV-00138-SCR

| | | |
|---|---|---|
| FRONT ROW MOTORSPORTS, INC. AND ROBERT A. JENKINS, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | **ORDER** |
| MICHAEL DISEVERIA AND RONALD C. DEVINE, | ) ) ) | |
| Defendants. | ) ) | |

**THIS MATTER** is before the Court following the bench trial conducted from September 18 through 20, 2023.

The parties have consented to Magistrate Judge jurisdiction pursuant to 28 U.S.C. § 636(c). The Court has reviewed all of the admissible evidence, including testimony, the trial exhibits, and the stipulations, and makes the following findings of fact and conclusions of law.

## I.  BACKGROUND

Plaintiffs purchased a NASCAR charter from BK Racing in December 2016.  After the purchase, Plaintiffs learned there was a lien against the charter claimed by Union Bank & Trust (now Atlantic Union Bank) (the "Bank"), which was memorialized in a Uniform Commercial Code ("UCC") Financing Statement.  Given the lien claimed by the Bank, Plaintiffs agreed to pay the remaining $1 million of the purchase price if the principals of BK Racing signed an Indemnity Agreement ("Indemnity Agreement").  In January 2017, Michael DiSeveria and Ronald C. Devine signed an Indemnity Agreement in their individual capacities.  Front Row Motorsports, Inc. and

1

Robert A. Jenkins initiated the instant lawsuit claiming DiSeveria and Devine breached the Indemnity Agreement by failing to defend Plaintiffs in response to a lawsuit brought by the Bank and failing to indemnify Plaintiffs for the amount paid to settle that lawsuit. Plaintiffs seek reimbursement of the settlement paid to the Bank, their reasonable attorneys' fees and costs incurred in defending themselves, their reasonable attorneys' fees and costs incurred in the present action, and pre- and post-judgment interest. DiSeveria and Devine claim that they do not owe Plaintiffs anything. [Doc. No. 57].

The Court previously <u>granted</u> partial summary judgment in favor of Plaintiffs as to the validity, enforceability, and breach of the Indemnity Agreement. As a result, Defendants' Counterclaim for a Declaratory Judgment that the Indemnity Agreement is unenforceable was dismissed. [Doc. No. 56].[1] The bench trial addressed the remaining issues in the case as set forth below in the findings of fact and conclusions of law.

## II.    STANDARD APPLICABLE TO BENCH TRIALS

When a case is tried without a jury, Federal Rule of Civil Procedure 52(a)(1) requires that the Court "must find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52. "To satisfy the demands of Rule 52(a), a trial court must do more than announce statements of ultimate fact. The court must support its rulings by spelling out the subordinate facts on which it relies." <u>United States ex rel. Belcon, Inc. v. Sherman Constr. Co.</u>, 800 F.2d 1321, 1324 (4th Cir. 1986).

Sitting as the finder of fact, a trial court may "disregard testimony of any witness when satisfied that the witness is not telling the truth, or the testimony is inherently improbable due to inaccuracy, uncertainty, interest, or bias." <u>Vienna Metro LLC v. Pulte Home Corp.</u>, 786 F. Supp.

---

[1] Defendants' objection to such ruling is noted and preserved.

2

2d 1090, 1092 (E.D. Va. 2011) (citing Penn-Texas Corp. v. Morse, 242 F.2d 243, 247 (7th Cir. 1957)); see also Columbus–Am. Discovery Grp. v. Atl. Mut. Ins. Co., 56 F.3d 556, 567 (4th Cir. 1995). "It is the duty of the trial judge sitting without a jury to appraise the testimony and demeanor of witnesses." Vienna Metro LLC, 786 F. Supp. 2d at 1092 (citing Burgess v. Farrell Lines, Inc., 335 F.2d 885, 889 (4th Cir. 1964)).

## III.  FINDINGS OF FACT

The Court makes the following findings of fact:

### A.  PARTIES

1.  Front Row Motorsports, Inc. ("Front Row") is a corporation that is engaged in American professional stock car racing.  [Stip. 1; Tr. 198:17-20].

2.  Robert A. Jenkins ("Jenkins") is Front Row's President and sole shareholder.  [Stip. 2; Tr. 198:21-22].

3.  BK Racing, LLC ("BK Racing") is a North Carolina limited liability company that is engaged in American professional stock car racing.  [Stip. 3; Tr. 199:6-8].

4.  Ronald Devine ("Devine") was BK Racing's President and was a member of Virginia Racers Group, LLC ("VRG"), which held a majority membership in BK Racing.  [Stip. 4; Tr. 199:9-12].

5.  Michael DiSeveria ("DiSeveria") was a member and principal of Foxboro LLC ("Foxboro").  Foxboro had a 4% membership interest in BK Racing until December 29, 2016. [Stip. 5; Tr. 199:13-16].

### B.  NASCAR CHARTER AND BANK'S ALLEGED SECURITY INTEREST

6.  In February of 2016, the National Association for Stock Car Auto Racing, Inc.,

NASCAR Event Management, Inc., and related corporate affiliates (collectively "NASCAR")[2] began a "charter system" and granted two Charter Member Agreements (each a "CMA") to BK Racing, identified as CMA 32 and CMA 33. [Stip. 6-7; Tr. 199:17-23; Pl. Ex. 24].

7. On or around May 31, 2016, BK Racing signed a Commercial Security Agreement ("Security Agreement") with Union Bank & Trust (now Atlantic Union Bank, and hereafter "Bank"). [Stip. 8]. The Security Agreement provides that BK Racing, as "Grantor," grants to the Bank "a security interest in the Collateral," which is defined as:

> All of Grantor's rights, title and interest. now or hereafter existing or hereafter acquired, in all assets of every kind and nature, including but not limited to the following:
>> (1) All of Grantor's rights, title and interest in that certain NASCAR Cup Series Charter Member Agreement, relating to assigned car number 83, by and among, Grantor, Borrower, NASCAR Event Management, Inc., and other NASCAR entities, dated as of February 8, 2016;
>> (2) All goods, equipment, tools, machinery, furnishings, furniture, fixtures, trade fixtures, motor vehicles and other personal property associated with Grantor's motor sports business;
>> (3) All general intangibles and any other assets of any type or category whatsoever of Grantor's motor sport business; and
>> (4) All accounts now or hereafter established or maintained with Lender, including but not limited to all reserve accounts, replacement reserve accounts, escrow accounts, operating accounts, checking accounts, savings accounts, money market accounts, certificates of deposit, and all other deposit accounts and other accounts of any description whatsoever.

> In addition, the word "Collateral" also includes all of the following[:]

>> (A) All accessions, attachments, accessories, replacements of and additions to any of the property described herein, whether added now or later.
>> (B) All products and produce of any of the property described in this Collateral Description section.
>> (C) All accounts, general intangibles, instruments, rents, monies, payments, and all other rights, arising out of a sale, lease, consignment or other disposition of any of the property described in this Collateral Description section.

---

[2] The parties have consistently used the term "NASCAR" to refer to the various NASCAR-affiliated entities identified in the CMAs. Any distinction between particular NASCAR entities is not relevant to the issues in the present case.

(D) All proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the property described in this Collateral Description section, and sums due from a third party who has damaged or destroyed the Collateral or from the party's insurer, whether due to judgment, settlement or other process.

(E) All records and data relating to any of the property described in this Collateral Description section, whether in the form of a writing, photograph, microfilm, microfiche, or electronic media, together with all of Grantor's right, title, and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media.

[Pl. Ex. 1 at 2-3; Tr. 199:24-200:2].

8. On June 7, 2016, the Bank filed a UCC-1 Financing Statement ("Financing Statement") [Stip. 9], which described the "Collateral" as:

All assets of the Debtor, of every kind and nature, now existing and hereafter acquired and arising and wherever located, including but not limited to, the following:

(1) All of Grantor's rights, title and interest in that certain NASCAR Cup Series Charter Member Agreement, relating to assigned car number 83, by and among Debtor, NASCAR Event Management, Inc., and other NASCAR entities, dated as of February 8, 2016;

(2) All goods, equipment, tools, machinery, furnishings, furniture, fixtures, trade fixtures, motor vehicles and other personal property associated with Debtor's motor sports business;

(3) All general intangibles and any other assets of any type or category whatsoever of Debtor's motor sport business;

(4) All accounts now or hereafter established or maintained with Lender, including but not limited to all reserve accounts, replacement reserve accounts, escrow accounts, operating accounts, checking accounts, savings accounts, money market accounts, certificates of deposit, and all other deposit accounts and other accounts of any description whatsoever; and

(5) All proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the property described above.

[Pl. Ex. 2; Tr. 200:3-6].

## C.    SALE OF CMA 33

9. On December 6, 2016, BK Racing entered into a Charter Purchase Agreement ("Charter Purchase Agreement") to sell CMA 33 to Front Row for $2 million. Devine signed the

Purchase Agreement in three separate capacities: as President, Team Owner, and Control Person of BK Racing. [Stip. 11; Pl. Ex. 4; Tr. 200:7-12].

10. Pursuant to the Charter Purchase Agreement, BK Racing agreed to sell CMA 33 "free and clear of all liens, encumbrances, mortgages or other claims . . . ." [Pl. Ex. 4]. Neither BK Racing nor Devine informed Front Row of the Security Agreement and Financing Statement at that time. [Tr. 25:3-26:6; 31:21-32:2; 268:16-24].

11. Pursuant to this sale, CMA 33 was transferred to Front Row on December 9, 2016, at which time Front Row delivered to BK Racing: (a) $1 million of the $2 million purchase price in cash; and (b) a $1 million promissory note. [Stip. 12; Pl. Ex. 4]. Front Row paid $1 million to BK Racing for the transfer of CMA 33 in December 2016, with the remaining $1 million to be delivered on January 9, 2017, provided certain conditions were met. [Stip. 12; Pl. Ex. 4; Tr. 24:18-25].

12. On December 23, 2016, Front Row received an anonymous fax that claimed there was a lien on CMA 33. The fax included a Financing Statement that the Bank had filed against BK Racing's assets in May of 2016. [Tr. 26:7-28:13; Pl. Ex. 61].

13. Front Row performed a UCC search and found the same UCC filing that was in the December 23, 2016 fax indicating the Bank had a lien on "(a)ll of grantor's rights, title and interest in that certain NASCAR Cup Series Charter Member Agreement, relating to assigned car number 83 . . . ." [Pl. Exs. 2, 61]. Jenkins concluded at the time that the Bank may have a lien on CMA 33 because CMA 33 was "Assigned Car Number 83" based on language in the CMA and the parties had referred to CMA 33 as the "number 83" Charter. [Tr. 28:5-29:20; Tr. 29:16-20; Pl. Exs. 6, 24, 61].

14. Front Row was concerned by the fax containing the UCC filing and reached out to Devine. [Tr. 27:5-13; Pl. Exs. 6, 32]. Front Row requested that Devine either provide the UCC-3 Financing Statement Amendment terminating the lien on CMA 33 or to change the collateral on the Financing Statement to CMA 32, which was a separate charter still owned by BK Racing at that time. [Tr. 30:3-34:7; Pl. Exs. 6, 32]. The Court did not find Devine credible on this issue, but Devine insinuated in response to Front Row there were "errors around the charter numbers" (as if there had been some mistake) and he was working to "clean[] up" the purported errors with the Bank. [Pl. Ex. 32; Tr. 240:21-241:16; 242:13-243:25]. Devine stated that the "UCC issues were my issues" and not Front Row's. [Pl. Ex. 32].

15. After learning of the Financing Statement and the lack of a UCC-3 Financing Statement Amendment, Front Row refused to pay the remaining $1 million of the purchase price of CMA 33. [Tr. 30:3-19; Pl. Exs. 6, 32, 61].

16. In January 2017, following discussions about the Financing Statement and its applicability to CMA 33, Front Row agreed to pay the remaining $1 million of the purchase price if the principals of BK Racing signed an Indemnity Agreement. [Tr. 34:16-35:4; Pl. Ex. 8; Stip. 13 ("In January 2017, a proposed [I]ndemnity [A]greement . . . was circulated by and among Plaintiffs and Defendants, among others.")].

17. Both Devine (on January 24, 2017) and DiSeveria (on January 25, 2017) signed the Indemnity Agreement. [Stip. 14-15; Pl. Ex. 8; Tr. 200:22-25]. The Indemnity Agreement stated in relevant part that Devine and DiSeveria:

> hereby fully indemnify and agree, each in his individual capacity, to jointly and severally hold harmless Robert A. Jenkins and Front Row Motorsports, Inc., its officers, directors, partners, agents and employees from and against any claims, liabilities, suits, proceedings, causes of action, or damages of any kind, whether in contract, tort or otherwise, that arise from or relate to claims by any and all third parties against one or both Indemnitees arising from or related to (a) the December

7

06, 2016 sale and transfer by BK Racing, LLC to Front Row Motorsports, Inc. of a NASCAR Cup Series Charter (number 33) Member Agreement; (b) any security agreements or financing statements seeking to be enforce [*sic*] against the Charter by any person or entity; (c) any person or entity claiming any interest, whether perfected or not, in the Charter, and (d) any judgment awards being levied against the Charter by any person or entity. The Indemnitors shall pay claims and losses in connection with the [*sic*] all of the foregoing and shall investigate and defend all claims, suits, or actions of any kind or nature, including appellate proceedings in the name of the applicable indemnified party, and shall pay all costs and judgments and attorney's fees which may issue thereon.

. . .

**Continuing Duties.** BK Racing, LLC. And [sic] its Members shall endeavor to satisfy all of its obligations clouding the Charter by obtaining UCC-3s (UCC Financing Statement Amendment – Termination) or by any other mechanism having the effect of terminating the security interests in the Charter.

[Pl. Ex. 8].

18.     Relying on Devine and DiSeveria's execution of the Indemnity Agreement and the representations of Defendants' then counsel, Front Row paid the remaining $1 million of the purchase price to BK Racing.  [Stip. 16.; Tr. 201:2-4].

19.     By signing the Indemnity Agreement, Devine and DiSeveria agreed to indemnify and defend Plaintiffs from claims, such as those brought by the Bank, related to the sale and transfer of CMA 33, or any security agreements or financing statements seeking to be enforced against CMA 33, or any person or entity claiming interest in CMA 33, or any judgment awards being levied against CMA 33.  Devine and DiSeveria also promised to endeavor to satisfy all of their obligations clouding CMA 33 by obtaining a UCC-3 Financing Statement Amendment terminating the Bank's security interest in CMA 33.  [Tr. 34:21-35:7; 36:5-13; Pl. Ex. 8].[3]

---

[3] As previously explained, the Court has already ruled that the Indemnity Agreement was valid and enforceable, and Devine and DiSeveria breached the Indemnity Agreement.  [Doc. No. 56].

8

20.     The Bank never terminated the Financing Statement at any time between June 7, 2016, and March 9, 2022, nor did the Bank switch or swap the Bank's interest in CMA 33 for CMA 32.  [Tr. 185:2-8; 194:23-195:15; 196:8-22 (Walsh Dep. 31:10-32:12, 58:10-21)].

## D.     BANK'S NON-LITIGATION ATTEMPTS TO ENFORCE THE SECURITY AGREEMENT

21.     Before filing any lawsuit, the Bank attempted to sell CMA 33 in a private disposition sale.  [Tr. 39:3-14; 43:10-44:1; Pl. Ex. 10; Def. Ex. OOO].

22.     On October 19, 2017, the Bank gave notice to Front Row and Jenkins (as a representative of Front Row) that it intended to foreclose on its purported lien on CMA 33 by issuing a Notice of Private Disposition of Collateral Under North Carolina Commercial Code (the "Disposition Notice"), wherein the Bank noticed a private sale of CMA 33 securing the indebtedness owed to the Bank.  [Stip. 17; Tr. 201:5-11; Pl. Ex. 10].

23.     In light of receiving the Disposition Notice, on October 30, 2017, Plaintiffs made their first written demand for indemnification to Defendants, stating that:

> [u]nder the terms of the Indemnity Agreement, each of you individually agreed to fully indemnify and jointly and severally defend and hold harmless [Plaintiffs] from and against 'any claims liabilities, suits, proceedings, causes of action, or damages of any kind . . . that arise from or relate to claims by any and all third parties' against one or both of [the Plaintiffs]. Under Paragraph 1, your duty to indemnify, defend and hold harmless [Plaintiffs] specifically includes the current attempts by [the Bank] to sell [CMA 33]. Indeed, as stated therein, you 'shall pay all claims and losses … and shall investigate and defend all claims, suits or actions of any kind or nature, . . . and shall pay all costs and judgments and attorney's fees which may issue therefrom.' Moreover, under Paragraph 3, BK Racing, LLC and each of you have continuing duties and obligations to fully resolve the claims of [the Bank] and any other person or entity seeking to assert any security interest in [CMA 33]. Based on upon the foregoing, [Plaintiffs] hereby demand . . . that each of you immediately take any and all actions necessary to address and fully resolve the claims and actions asserted by [Bank] with respect to [CMA 33].

[Tr. 201:12-15; Pl. Ex. 11].

24.     Devine and DiSeveria each received the October 30, 2017 letter sent by counsel for Plaintiffs, Ronald A. Skufca, titled "Notice of Duty to Defend and Hold Harmless."  [Stip. 18; Tr. 201:12-15].

25.     Devine and DiSeveria did not respond to the October 30, 2017 letter.  [Tr. 40:16-42:3].

26.     As of October 30, 2017, Front Row and Jenkins had not incurred significant attorneys' fees and costs.  [Tr. 41:13-19].

27.     Two days later, on November 1, 2017, Devine sent a letter to Michael Walsh at the Bank offering to pay the sum of $4 million cash to the Bank:

> in exchange for [the Bank] delivering to [BK Racing] all assets of [BK Racing] in which [the Bank] claims a security interest free and clear of all security interests.  More specifically these [BK Racing] assets include both NASCAR charters #32 and #33. . . as set forth in various security agreements and UCC Financing statements that have been recorded by [the Bank].

[Pl. Ex. 34].

28.     Meanwhile, by letter dated November 15, 2017, counsel for the Bank asked NASCAR to approve the Bank's proposed private disposition.  [Stip. 22; Tr. 202:2-4].

29.     Neither NASCAR Event Management nor NASCAR ever consented to a request by the Bank to sell CMA 33.  [Stip. 23; Tr. 202:5-6].  NASCAR would not agree to a sale of CMA 33 without a court order.  At the time of this attempted private disposition sale in late 2017, the Bank had not obtained a court order to sell or transfer CMA 33.  [Tr. 39:3-14; 43:10-44:1; Def. Ex. OOO].

E.      **BANK'S NORTH CAROLINA LITIGATION**

30.     On November 17, 2017,[4] the Bank filed a Complaint against BK Racing,

---

[4] Erroneously identified as November 15, 2017 in the Joint Stipulations.  [Doc. No. 57].

Front Row, and others in North Carolina state court, seeking, among other things, an order from the court declaring that the Bank held a lien against CMA 33, permitting the Bank the right to foreclose and sell CMA 33, and extinguishing all of Front Row's rights, title and interest thereto (the "North Carolina Litigation"). [Stip. 24; Tr. 202:7-12; Pl. Ex. 19].

31.     Jenkins reviewed the Complaint filed by the Bank in the North Carolina Litigation, and Jenkins credibly testified that he was worried about Front Row being brought into one of BK Racing's lawsuits. [Tr. 45:10-19; Pl. Ex. 19].

32.     On February 1, 2018, Devine asked Jenkins to lend him $2.75 million against CMA 33 so that Devine could send Jenkins' money to the Bank to settle the Bank's lien claim against CMA 33 and the claims against Front Row in the North Carolina Litigation. [Pl. Ex. 44, at 1]. In response, Jenkins declined to lend him the money as he was under no obligation to do so. Rather, Jenkins indicated that he hoped Devine could settle with the Bank before the trial in the North Carolina Lawsuit as that was Devine's duty under the Indemnity Agreement.[5] [Tr. 45:24-50:7; Pl. Ex. 44].

33.     Both Devine and Jenkins credibly testified that the value of CMA 33 had substantially increased since the sale from BK Racing to Front Row in December 2016. [Tr. 279:17-280:12; Tr. 49:24-50:3; Tr. 51:13-53:10]. Jenkins credibly testified he was worried about losing the investment in CMA 33 because of the Bank's claims. [Tr. 73:9-25; Tr. 80:18-90:7; Tr. 97:21-98:6].

---

[5] As important context to this timeframe, on February 15, 2018, BK Racing filed a bankruptcy petition in the United States Bankruptcy Court for the Western District of North Carolina. In re BK Racing, LLC, No. 18-30241 (Bankr. W.D.N.C.). Later, in August 2018, Front Row purchased CMA 32 (separate from CMA 33) from BK Racing for roughly $2 million in BK Racing's bankruptcy proceedings. NASCAR approved of this sale pursuant to a court ordered sale of CMA 32 from BK Racing to Front Row. [Tr. 50:18-51:9].

11

34.     Front Row, at its own expense, defended itself in connection with the Disposition Notice and the North Carolina Litigation, involving CMA 33.  [Stip. 25; Tr. 202:13-15].

35.     On March 30, 2020, the Bank filed a voluntary dismissal of the North Carolina Litigation without prejudice.  [Stip. 26; Tr. 202:16-18].

F.      **BANK'S VIRGINIA LITIGATION**

36.     On March 31, 2020, the Bank sued Front Row and BK Racing in Virginia state court (the "Virginia Litigation").  [Stip. 27; Tr. 202:19-21].

37.     The Bank filed a First Amended Complaint in June 2020 and brought claims for declaratory judgment, breach of contract, fraudulent conveyance, tortious interference with contract and statutory business conspiracy.  [Def. Ex. AA].

38.     In the Virginia Lawsuit, the Bank requested not less than $2.75 million trebled to $8.25 million pursuant to Va. Code § 18.2-500(A), punitive damages in the amount of $350,000.00, and the Bank's costs and reasonable attorneys' fees under the Security Agreement and under Virginia law.  [Def. Ex. AA].

39.     The Bank also sought a declaration that "the Bank ha[d] a duly perfected first-priority security interest in the Collateral" and "Front Row acquired [CMA 33] subject to the Bank's duly perfected first-priority security interest . . . ."  [Def. Ex. AA, at 12-13].  The Bank sought an order voiding and setting aside the Charter Purchase Agreement and granting the Bank "immediate possession of [CMA 33] with the right to dispose of [CMA 33] . . . and apply any proceeds of the disposition to the secured indebtedness and to the reasonable attorney's fees and legal expenses incurred by the Bank."  [Def. Ex. AA, at 12-13].

40.     Front Row retained and paid counsel to defend it in the Virginia Litigation.  [Stip. 31; Tr. 203:9-10].

12

41.     In light of the Virginia Lawsuit, Front Row made another written demand for indemnification to Devine and DiSeveria on April 29, 2020.  [Pl. Ex. 12].

42.     Devine and DiSeveria each received the April 29, 2020 letter sent by counsel for Plaintiffs, titled "Renewed Demand and Notice of Obligations Under Indemnity and Hold Harmless Agreement."  [Stip. 28; Tr. 202:22-203:1].

43.     Despite the written Indemnity Agreement and another written demand for indemnification, Devine and DiSeveria did not indemnify Front Row, defend Front Row, or pay for Front Row's attorneys' fees at this time.  [Pl. Ex. 8; Tr. 56:10-13].

44.     On January 11, 2021, Front Row sent yet another letter to DiSeveria's attorneys asking DiSeveria to defend and indemnify Front Row and to respond by January 18, 2021.  [Pl. Ex. 14].

45.     Devine and DiSeveria each received the January 11, 2021 letter sent by counsel for Plaintiffs titled "Renewed Demand and Notice of Obligations Under Indemnity and Hold Harmless Agreement."  [Stip. 29; Tr. 203:2-6].

46.     Despite the written Indemnity Agreement and another written demand for indemnification, Devine and DiSeveria still did not indemnify Front Row, defend Front Row, or pay for Front Row's attorneys' fees.  [Tr. 56:24-58:19; Pl. Ex. 14].

47.     Instead, on January 29, 2021, counsel for DiSeveria and Devine responded stating that "I have now had an opportunity to have heard back from Mike DiSeveria and Ron Devine regarding the lawsuit. They both seemed generally amicable to assisting in providing information to help defend the lawsuit . . . and expressed interest in teaming up against the bank."  [Tr. 59:3-61:23; Pl. Ex. 62].  DiSeveria and Devine's response did not state that DiSeveria and Devine were

willing to take over the defense of Front Row in the pending Virginia Lawsuit, nor did they pay for Front Row's attorneys' fees.  [Id.].

48.     On January 27, 2021, Front Row filed a third-party action against Devine and DiSeveria in the Virginia Litigation.  [Stip. 30; Tr. 203:7-8].

49.     Jenkins became increasingly concerned because he felt less confident in Front Row's ability to defend against the Bank's claims and that he could lose his race team associated with CMA 33.  Jenkins also was concerned about Front Row's ability to defend itself because Front Row was in the position of relying on Devine and DiSeveria to provide Front Row with information regarding their prior dealings with the Bank.  [Tr. 57:16-58:19; 63:18-64:17; 73:23-25; 89:15-25].

50.     The Bank claimed that it was owed a total payoff of $12,112,307.49 as of March 9, 2022, for seven loans (the "Loans") that were secured by a security interest in CMA 33 created by the Security Agreement and the Financing Statement.  [Stip. 32; Tr. 203:11-14; Pl. Exs. 1, 2, 30; Tr. 195:3-4 (Walsh Dep. Tr. 17:10-23)].

51.     Between January 12, 2021, and March 5, 2021, Front Row's counsel and Devine and DiSeveria's counsel exchanged a series of e-mails regarding the then-pending Virginia Litigation and Front Row's Third-Party Complaint against Devine and DiSeveria filed in the Virginia Litigation, of which certain e-mail threads were stipulated to and admitted at trial without objection.  [Pl. Ex. 62-67].

52.     On February 3, 2021, counsel for Front Row provided counsel for Devine and DiSeveria with the Third-Party Complaint and asked them to accept service on Devine's and DiSeveria's behalf.  [Pl. Ex. 63, at 2].  Counsel for Front Row also had sent an email to counsel

for Devine and DiSeveria on January 29, 2021, asking for authority to accept service on Devine and DiSeveria's behalf. [Tr. 63:18-64:25; Pl. Ex. 63, at 2-3].

53.    On February 15, 2021, Devine conveyed through counsel that he was "<u>exceedingly disappointed</u>" that he was brought into the Virginia Lawsuit and that:

> Front Row's decision to take an adversarial posture towards himself and Mr. DiSeveria – i.e. the two very people whose testimony Front Row will likely need to prevail – as not only ill advised, but almost certainly disastrous to any chance Front Row might have in prevailing here.

[Pl. Ex. 64 (emphasis in original); Tr. 65:25-71:15]. Counsel further stated that "Mr. Devine has asked us to make it crystal clear that <u>if Front Row expects any cooperation in this lawsuit, it must immediately Non-suit [*sic*] the claims it has brought against himself and Mike [DiSeveria]</u>." [Pl. Ex. 64 (emphasis in original)].

54.    On February 22, 2021, the Bank moved to sever Front Row's Third-Party Complaint against Devine and DiSeveria from the Bank's Complaint in the Virginia Litigation in order to obtain a separate trial on such matters. [Def. Ex. DD].

55.    On February 23, 2021, counsel for Front Row sent an email to counsel for Devine and DiSeveria renewing their request that Devine and DiSeveria "honor their obligations under the Indemnity . . . Agreement" and "engage" with the Front Row to disclose all facts and defenses known to them to aid Front Row in the Virginia Lawsuit. [Pl. Ex. 65].

56.    Counsel for Devine and DiSeveria responded on March 4, 2021, stating they believed there were some issues with the Indemnity Agreement and declined to provide facts and defenses known to them related to the Virginia Lawsuit. [Pl. Ex. 66].

57.    On March 5, 2021, counsel for Front Row again requested that Devine and DiSeveria disclose facts and defenses related to the Bank's claim that it had a lien on CMA 33.

Counsel for Front Row also requested the addresses of Devine and DiSeveria for service of the Third-Party Complaint. [Pl. Ex. 67].

58. On March 24, 2021, Devine and DiSeveria's Virginia counsel entered a notice of appearance in the Virginia Litigation on behalf of DiSeveria and filed written opposition to the Bank's Motion for Separate Trials. [Def. Ex. EE].

59. It was not until April 6, 2021, that counsel for Devine and DiSeveria advised that they could accept service on behalf of DiSeveria but not for Devine. [Pl. Ex. 68].

60. On May 7, 2021, Devine and DiSeveria's Virginia counsel entered a notice of appearance in the Virginia Litigation on behalf of Devine. [Def. Ex. HH].

61. Between March 31, 2021, and March 8, 2022, Front Row's counsel and Devine and DiSeveria's Virginia counsel exchanged a series of e-mails (some including counsel for the Bank, and others omitting the Bank) regarding the then-pending Virginia Litigation, defenses to the Bank's claims and potential settlements of the Bank's and Front Row's claims. [Pl. Exs. 62-68, 70-75, 77-78].

62. Devine and DiSeveria testified about having phone calls with Jenkins in early 2022 in which they claimed that Jenkins promised them that he "would not settle without [Devine and DiSeveria]." [Tr. 258:1-12; 281:2-5; 301:9-302:20]. Jenkins credibly testified that he did not tell either of Defendants that he "would withhold going to any settlement meeting without BK Racing or him." [Tr. 325:5-327:3]. In fact, the weight of the evidence shows Front Row and Jenkins attempted to involve Devine and DiSeveria multiple times in settlement discussions to no avail. [Pl. Exs. 44, 72, 75].

63. On January 27, 2022, the Bank filed its Motion for Summary Judgment. [Pl. Ex. 15]. Jenkins credibly testified that he became less confident that Front Row would prevail in the

16

Bank's lawsuit and, after reading the motion, Jenkins believed that the Bank had a good chance of succeeding on summary judgment.  [Pl. Ex. 15; Tr. 80:17-81:18; 325:20-23].

64.    On January 28, 2022, counsel for Devine and DiSeveria communicated some legal defenses in writing to Front Row and Jenkins.  [Pl. Ex. 70].  In this same e-mail, counsel for Devine and DiSeveria indicated "we think that there is statutory argument to be made that EVEN IF [the Bank] had/has a perfected UCC-Lien on the charter as of 2017, the actual rights conferred on [the Bank] by that lien are fairly minimal" and "[e]ssentially, [the Bank's] rights are limited to claiming a priority lien on the proceeds of the sale."  Counsel went on to acknowledge that "maybe [the Bank] can claim an interest in the traceable proceeds of the sale from BK to Front Row . . . ."  Jenkins interpreted this email as an admission by Defendants that "the [B]ank did have some rights [in CMA 33]."  [Pl. Ex. 70; Tr. 85:4-89:4].

65.    The January 28, 2022 email from counsel for Devine and DiSeveria also stated in an attached memorandum that the disjunctive word "or" in UCC-9-203 was a "big problem for the theory that the security interest failed as a result [of] non-notice to NASCAR."  [Pl. Ex. 70 at 6].  Jenkins was even more concerned that he had received information from Defendants at the summary judgment stage of the litigation that they had a big problem with one of their main defenses.  [Tr. 86:25-88:25; Pl. Ex. 70 at 6].

66.    On February 7, 2022, counsel for the Bank emailed counsel for Front Row and Devine and DiSeveria stating that the Bank would agree to mediate the Virginia Lawsuit if the Bank received a "reasonable payment proposal from Devine-Front Row."  [Pl. Ex. 71].

67.    On February 25, 2022, the Bank noticed a hearing in the Virginia Litigation, set for March 18, 2022, relating to the Bank's Motion for Summary Judgment on Count I of the Bank's First Amended Complaint against Front Row.  [Stip. 33; Tr. 203:15-17].

17

68. On February 28, 2022, counsel for Front Row emailed counsel for Devine and DiSeveria to ask whether Devine and DiSeveria were willing to commit to funding a settlement offer to propose to the Bank. Counsel for Devine and DiSeveria responded that they had no authority from Devine and DiSeveria to fund a settlement offer. [Pl. Ex. 72].

69. On February 28, 2022, counsel for Front Row deposed Michael Walsh ("Walsh") in this action. Walsh was the corporate representative of the Bank. Walsh confirmed that the Bank was owed over $12 million on the lien that it had against CMA 33. Jenkins listened to this deposition as it was originally taking place. [Tr. 185:2-8; 194:23-195:15; 196:8-22 (Walsh Dep. 9:15-10:13, 17:10-23); Tr. 94:22-95:13].

70. On March 4, 2022, the Bank offered to settle its claims in the Virginia Litigation in exchange for receiving $3.5 million. [Stip. 34; Tr. 203:18-20; Pl. Ex. 73].

71. The settlement offer was sent to Front Row and Devine and DiSeveria's counsel and stated that the offer would be held open until 5pm on March 10, 2022. [Pl. Ex. 73].

72. Jenkins credibly testified that he was relieved when he received this settlement offer because he believed it was a good starting point, and he thought the Bank could have been "way more predatory." [Tr. 98:7-100:7].

73. In response to this settlement offer, Devine and DiSeveria did not offer to take over negotiations with the Bank. [Tr. 100:13-20].

74. Front Row asked DiSeveria and Devine, on multiple occasions, to take over negotiations with the Bank and to contribute financially a settlement, including:

    (a)    On February 28, 2022, Front Row's counsel and Devine and DiSeveria's counsel exchanged emails stating:

Our clients have once again asked if there was any update or change in either of your client's views regarding their willingness to commit to any funding of a settlement offer

18

to propose to the Bank. We understand that currently there is not any interest in proposing any settlement from either Devine or DiSeveria. If this remains to be the case, then please let us know as we want to be able to let our clients know that we've reached out to you again to confirm.

. . .

As of this afternoon, we don't have any additional news. Their position may well change, and they remain willing to participate in a mediation, but **as matters stand right now we have no authority**.

[Tr. 96:16-98:6; Pl. Ex. 72 (emphasis added)].

(b)     On Monday, March 7, 2022, Front Row's counsel and Devine and DiSeveria's

counsel exchanged emails stating:

Given the Bank's recent settlement offer delivered on Friday, our clients have once again asked if there was any update or change in either of your client's views regarding their willingness to commit to any funding of a settlement offer to propose to the Bank. We understand that currently there is not any interest in proposing any settlement from either Devine or DiSeveria. If this remains to be the case, then please let us know by 3:30 p.m. today as we want to be able to let our clients know that we've reached out to you again to confirm.

…

I just spoke with Ron and **he is still evaluating this**. He'd like to talk to Mr. Jenkins directly about a proposal. Would you be amenable to that?

…

Thank you for calling me about the below. I've passed along the information that Ron Devine wanted to talk with Bob directly. **Thank you for confirming that neither Devine nor DiSeveria are willing to contribute anything towards any settlement offer to the Bank at this time. Again, if this changes, please let us know as this would significantly impact Front Row's decision making in responding to the Bank's recent settlement offer**.

[Tr. 103:13-106:5; Pl. Ex. 75] (emphasis added).

(c)     On Tuesday, March 8, 2022, at 10:30 a.m., Front Row's counsel sent Devine

and DiSeveria's counsel an email containing the following demand:

Given that the Bank has recently submitted a global settlement offer to release its purported lien on Charter 33 and to drop all of its claims against Front Row in this lawsuit in exchange for receiving a $3,500,000 lump sum payment, **Front Row demands that Devine and/or DiSeveria pay the Bank its demanded lump sum payment. Since the Bank has stated that its offer expires this Thursday, Front Row demands that Devine and/or DiSeveria notify Front Row by no later than close of business today whether they will make this payment to the Bank.** If they do not, Front Row may settle with the Bank without having received any contribution from Devine or DiSeveria. If our

19

client settles with the Bank without receiving any contribution from Devine and/or DiSeveria, then Front Row will seek reimbursement from Devine and DiSeveria for whatever amounts that Front Row paid to the Bank to settle the claims (plus its defense costs and attorneys' fees) pursuant to the terms of the Indemnity and Hold Harmless Agreement that Devine and DiSeveria signed.

[Tr. 109:1-111:2; Pl. Ex. 77] (emphasis added).

75.     Between March 4, 2022, and March 8, 2022, Front Row's counsel and the Bank's counsel exchanged a series of e-mails relating to specific settlement negotiations between the Bank and Front Row.  [Pl. Ex. 76].

76.     On March 7, 2022, counsel for Devine and DiSeveria sent to counsel for Front Row a draft Motion for Partial Summary Judgment and Memorandum in Support of the same.  In this same email, counsel for Defendants stated "[a]s to Count I (declaratory judgment) 9-408(d) says what a secured party doesn't have . . . not what it does have. That's on [the Bank's counsel and the Bank] to establish. I think the answer is a lien on the proceeds of disposition . . . and possibly a continuing limited effectiveness lien on CMA 33. But that's underemphasized here because again, that's on [the Bank]."  [Pl. Ex. 74].  This email added to Jenkins' belief that the Bank could prevail in the Virginia litigation.  [Id.; Tr. 102:17-24; 180:7-181:22].

77.     Beginning at 4:47 p.m. on March 7, 2022, after confirming that Devine and DiSeveria would not be contributing to any settlement offer [Pl. Ex. 75], Front Row and Jenkins made a settlement offer of $1.5 million to the Bank.  [Pl. Ex. 76].

78.     Jenkins felt $1.5 million was a prudent offer in light of the risk of potential liability, and that the Bank could recover all or most of the value of CMA 33 if the court were to order a sale.  [Tr. 107:6-108:19].

79.     Jenkins, as an owner of a NASCAR Charter, has access to information on all sales of NASCAR Charter Member Agreements.  As such, Jenkins was aware of one of the bottom three

ranking CMAs selling for approximately $12 million in 2022. Additionally, Jenkins had put five to six years of work into building up CMA 33, which he believed increased the value of CMA 33. As a result, Jenkins believed that the value of CMA 33 as of March 2022 was over $12 million. [Tr. 52:22-53:22]. Devine similarly believed the value of CMA 33 had increased substantially. [Tr. 279:17-280:12].

80.     At the time, Jenkins thought he might lose CMA 33 as a result of the litigation with the Bank, damage Front Row's reputation, and face other NASCAR consequences. If Jenkins lost CMA 33 through a forced sale when the racing season had already commenced, Jenkins believed he stood to lose a significant amount of money from breaching multiyear sponsor contracts and driver contracts, and having to terminate employees and drivers. [Tr. 73:23-25; 89:15-25; 138:21-139:4; 139:16-19; 141:5-21].

81.     On March 8, 2022, at 10:30 a.m., Front Row's counsel emailed counsel for Devine and DiSeveria renewing its demand that they defend and indemnify Front Row under the Indemnity Agreement and pay the $3.5 million settlement demand made by the Bank. Front Row's counsel demanded a response by the close of business on March 8, two days before the Bank's settlement deadline, regarding whether Devine and DiSeveria would make payment to the Bank and, if not, stated that Front Row may settle with the Bank without having received any contribution from Devine and DiSeveria. Front Row's counsel also advised that if Front Row did settle with the Bank without Devine and DiSeveria's contribution, that Front Row would seek reimbursement from Devine and DiSeveria for the settlement amount plus costs and attorneys' fees. [Pl. Ex. 77].

21

82.     On March 8, 2022, at 2:37 p.m., counsel for Devine and DiSeveria provided Front Row's counsel with a copy of their filed Motion for Partial Summary Judgment and the Memorandum in Support of the same. [Pl. Ex. 78].

83.     The Motion for Partial Summary Judgment stated, in part, that Devine and DiSeveria were asking the court to grant partial summary judgment on the Bank's lien claim by declaring as a matter of fact and law that the Bank's rights as a secured lender in collateral as applied to CMA 33 are limited to a claim in proceeds from the disposition or sale of such CMA 33. Jenkins reviewed the Motion for Partial Summary Judgment and the supporting memorandum and understood that Devine and DiSeveria were not seeking a complete dismissal of the Bank's claims and that Front Row still faced potential liability. [Tr. 111:10-115:13; Pl. Ex. 78].

84.     Based on the weight of the evidence, Jenkins and Front Row reasonably believed that they risked potential liability from the Bank's lawsuit including that the Bank would prevail on its lien claim and recover attendant attorneys' fees and costs. [Tr. 73:23-25; 89:15-25; 102:17-24; 138:21-139:4; 139:16-19; 141:5-21; 180:7-181:22; Tr. 203:11-14; Pl. Exs. 15, 70, 74; Tr. 196:8-22 (Walsh Dep. 9:15-10:13, 17:10-23)].

85.     The anticipated costs of the summary judgment hearing and trial, which was expected to last four days, were another factor in the timing of the settlement. [Pl. Ex. 71; Tr. 141:22-25; 325:18-326:1; 328:3-10].

86.     On March 8, 2022, at 3:00 p.m., counsel for Devine and DiSeveria sent a settlement offer to counsel for Front Row and Jenkins. Defendants offered Plaintiffs two potential settlements: (1) Defendants will pay $250,000 in cash to Front Row and Devine will deliver to Front Row a 10-year note for a one-million-dollar loan in exchange for Plaintiffs dismissing the third-party complaint against Defendants and releasing DiSeveria and Devine from any indemnity or

contribution claims related to CMA 33, among other things; or (2) Defendants will pay $3.5 million to Front Row in exchange for CMA 33. [Pl. Ex. 36]. DiSeveria credibly testified that the $250,000 cash would be coming from him, and not Devine, and DiSeveria believed there were not any other negotiations after this offer. [Tr. 310:8-25].

87. Jenkins credibly testified that he did not believe either of these were serious offers for multiple reasons. First, Jenkins did not ask Defendants for an offer to purchase CMA 33, but rather he asked them to settle the Bank's claims. Devine and Jenkins both believed that CMA 33 was worth more than $12 million in March 2022, and yet this purchase offer for $3.5 million would effectively provide a windfall to Defendants of approximately $8.5 million if accepted. Second, Jenkins did not consider the offer to pay some cash now with a balloon payment 10 years later for $1 million, only secured by the promise of Devine, not DiSeveria, as a serious offer. The Bank's demand was $3.5 million and there was no indication that Bank would settle for $250,000 today and wait for another $1 million in ten years. Additionally, neither of these settlement offers addressed to Front Row resolved the claims the Bank had against Plaintiffs in the Virginia Lawsuit. Therefore, Jenkins declined these offers. [Tr. 117:17- 124:13; Pl. Ex. 36].

88. Despite Devine and DiSeveria's settlement offers sent to Plaintiffs on March 8, 2022, Devine and DiSeveria testified that neither of them would have settled with the Bank [Pl. Ex. 36; Tr. 290:1-6; 314:18-315:3], and the Court finds this placed Jenkins and Front Row in the position of having to resolve the Virginia Litigation entirely on their own.

89. On March 10, 2022, Front Row and the Bank signed a settlement agreement ("Settlement Agreement") settling the Bank's claims against Plaintiffs for $2.1 million ("Settlement Payment") as more particularly set forth in the Settlement Agreement. [Stip. 35; Tr. 203:21-24; Pl. Ex. 18].

90.     After signing the Settlement Agreement, the Bank dismissed its claims in the Virginia Litigation (on March 23, 2022) and filed a UCC-3 Financing Statement Amendment terminating its security interest with respect to CMA 33 (on March 16, 2022). [Stip. 36; Tr. 203:25-204:3; Pl. Exs. 17, 22].

91.     Jenkins believed that Front Row's settlement with the Bank was a good business decision because it kept his race team in business. [Tr. 138:21-139:15].

92.     Jenkins and Front Row negotiated that the Settlement Payment received by the Bank was applied towards BK Racing and Devine's outstanding loans owed to the Bank, ultimately benefiting Defendants, even though Defendants did not contribute to the Settlement Payment. [Pl. Exs. 18, 30]. It is undisputed that the Bank did, in fact, apply the entire Settlement Payment to the indebtedness it alleged was secured by CMA 33. [Tr. 185:2-8; 194:23-195:15; 196:8-22 (Walsh Dep. 55:2356:7), Pl. Exs. 60, 18 ¶ 2.].

93.     Front Row and Jenkins acted in good faith during the settlement negotiations with the Bank.[6]

94.     As between Plaintiff Front Row and Defendants, the Virginia Litigation ended upon Front Row's nonsuit of its Third-Party Complaint against Defendants on March 23, 2022. [Def. Ex. SS].[7]

## G.    ATTORNEYS' FEES AND COSTS IN THE PRIOR LITIGATION

95.     On October 28, 2017, Front Row hired Skufca Law, PLLC, formerly Moretz & Skufca, upon receiving the Disposition Notice from the Bank. [Tr. 134:17-24].

---

[6] See also the Court's Conclusions of Law on good faith at J, K, L.
[7] The Court takes judicial notice of the filings from the state court proceedings. See Sun Chems. Trading Corp. v. CBP Res., Inc., No. 1:01CV00425, 2004 U.S. Dist. LEXIS 15460 (M.D.N.C. June 3, 2004); see also Fed. R. Evid. 201(b).

96. The Indemnity Agreement provided that Devine and DiSeveria "shall pay claims and losses," "shall investigate and defense all claims, suits, or actions of any kind or nature," and "shall pay all costs and judgments and attorney's fees which may issue thereon." [Pl. Ex. 8].

97. Defendants Devine and DiSeveria did not pay Plaintiffs Front Row and Jenkins anything towards attorneys' fees and costs that Plaintiffs incurred from October 2017 through the date that the Virginia Lawsuit was settled and dismissed. [Tr. 136:2-4].

98. Despite Defendants signing the Indemnity Agreement, Defendants did not offer to take over or pay for Front Row's defense of the Bank's claims at any point. [Tr. 136:5-8; Pl. Exs. 8, 62-68, 70-78].

99. In addition to the Settlement Payment, Plaintiffs were billed, and paid, $412,397.48 in legal fees and costs related to the defense and response required arising out of and in connection with the Disposition Notice, North Carolina Lawsuit and Virginia Lawsuit. No stipulation was made as to the propriety or reasonableness of any fees billed or paid. [Stip. 37; Tr. 204:4-10].

## H. CONDUCT OF PARTIES FOLLOWING DISMISSAL OF VIRGINIA LITIGATION TO PRESENT LITIGATION

100. On March 23, 2022, Plaintiffs Front Row and Jenkins served a "Final Demand and Notice of Obligations Under Indemnity and Hold Harmless Agreement" demanding indemnification for Plaintiffs' defense and expenses related to the Virginia Litigation. [Pl. Ex. 16].

101. Devine and DiSeveria each received the March 23, 2022 letter sent by counsel for Plaintiffs. [Stip. 38; Tr. 204:11-15].

102. On March 30, 2022, Devine and DiSeveria filed a lawsuit in Virginia state court (the "Defendants' Virginia Lawsuit"). [Stip. 39; Tr. 204:16-18].

25

103. Defendants' Virginia Lawsuit was removed from Virginia state court to the United States District Court for the Eastern District of Virginia. The District Court conducted a contested, in-person hearing attended by Plaintiffs' and Defendants' counsel. The District Court transferred the action to the Western District of North Carolina. The action was then dismissed without prejudice on July 13, 2022. [Stip. 40; Stip. 204:19-205:2; Stipulation of Dismissal Without Prejudice, DiSeveria et al. v. Front Row Motorsports, Inc., No. 3:22-cv-00294, Doc. No. 14].

104. On April 1, 2022, Plaintiffs filed the present action, stating a single claim for breach of contract, that is, the Indemnity Agreement, and seeking to recover the Settlement Payment plus their legal fees and costs. [Doc. No. 1].

## IV.   CONCLUSIONS OF LAW

The Court makes the following conclusions of law:

A. This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1332 because there is complete diversity of citizenship of the parties and the amount in controversy exceeds $75,000.

B. The Court has personal jurisdiction over the parties pursuant to the consent to jurisdiction provision in the Indemnity Agreement and because Defendants have substantial contacts in this District and North Carolina generally.

C. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) because Defendants are subject to personal jurisdiction in this District, and a substantial part of the events giving rise to this case or controversy occurred in this District.

D. There is an actual controversy, and the matter is ripe for decision.

E. The Indemnity Agreement contains a choice of law provision entitled "Governing Law," which states "[t]his Indemnity is delivered in the State of North Carolina, and it is the intent

of Indemnitors and Indemnitees that this Indemnity shall be deemed to be a contract made under and governed by the internal laws of the State of North Carolina, without regard to its principles of conflicts of law." [Pl. Ex. 8]. The parties do not dispute that North Carolina law applies.

      F.    Under North Carolina law:

> when an indemnitee seeks to be indemnified after a settlement with a third party, its burden depends on the notice given to the indemnitor. An indemnitor that receives adequate notice of the underlying third-party claim and [has] an opportunity to be heard is bound by a reasonable, good-faith settlement of that claim so long as the indemnitee can show potential liability. If the indemnitor receives no notice or inadequate notice, the indemnitee may prevail only if it can show actual liability.

Banc of Am. Merch. Servs., LLC v. Arby's Rest. Grp., Inc., 20 CVS 426, 2021 WL 2695474, at *9 (N.C. Super. Ct. June 30, 2021); see also Kirkpatrick & Assocs., Inc. v. Wickes Corp., 280 S.E.2d 632, 636 (N.C. Ct. App 1981) (where an indemnitor received notice of the underlying claim and is invited to assume the defense but refuses to do so, "[a] settlement is presumed to be fair and reasonable, and the burden of showing a lack of good faith is upon the party asserting it.") (citing Wheeler v. Denton, 175 S.E.2d 769, 772 (N.C. App. 1970)); Bridgestone/Firestone, Inc. v. Ogden Plant Maintenance Co. of North Carolina, 548 S.E.2d 807, 811-812 (N.C. App. 2001).

      G.    The Court concludes: (1) Defendants had adequate notice of the Bank's claims and Plaintiffs' demand that Defendants indemnify them under the Indemnity Agreement; and (2) Defendants had an opportunity to be heard. The overwhelming weight of the evidence in the record supports this conclusion along with the Stipulations agreed to by Defendants. After the Bank gave Front Row notice that it intended to foreclose on its purported lien on CMA 33, Front Row, Jenkins, or Plaintiffs' counsel, on their behalf, sent Devine and DiSeveria a letter titled "Notice of Duty to Defendant and Hold Harmless" on October 30, 2017. [Pl. Exs. 10, 11]. Devine and DiSeveria stipulate that they received the October 30, 2017 letter. [Stip. 18]. Thereafter, over

the course of the underlying Bank litigation, Plaintiffs, through counsel, sent letters on April 29, 2020, January 11, 2021, and March 23, 2022, with continued notice of the Bank's claims and renewing their demand that Defendants indemnify Plaintiffs as required under the Indemnity Agreement signed by Defendants.  [Pl. Exs. 12, 14, 16].  The letters also continued to request that Defendants defend Plaintiffs or pay Plaintiffs' attorneys' fees, also as required under the Indemnity Agreements signed by Defendants.  [Id.].  Defendants stipulated to receiving each of these letters from Plaintiffs' counsel.  [Stip. 28, 29, 38].  Defendants also had several opportunities to be heard as they were participating in the underlying Bank's lawsuit and filed a Motion for Partial Summary Judgment.  [Pl. Ex. 78].  Defendants and/or their counsel also had discussions with the Bank and/or its counsel and with Plaintiffs' counsel.  [Pl. Exs. 71-77].

H.     The Court further concludes that Plaintiffs demonstrated that they faced potential liability in the underlying Bank's lawsuit related to the claimed lien on CMA 33.  There is ample evidence in the record to support this conclusion, including the following: The Bank filed a UCC Financing Statement indicating that the Bank had a lien on "(a)ll of grantor's rights, title and interest in that certain NASCAR Cup Series Charter Member Agreement, relating to assigned car number 83 . . . ."  [Pl. Ex. 2].  The Bank continued to pursue its lien claim against CMA 33, first with a Disposition Notice, then with litigation in North Carolina and then Virginia.  [Pl. Exs. 10, 19; Def. Ex. AA].  Even counsel for Devine and DiSeveria acknowledged in a January 28, 2022 email to Plaintiffs that the Bank likely had a claim for the proceeds of the sale of CMA 33 when Front Row decided to sell the Charter, and that the disjunctive word "or" in UCC-9-203 was a "big problem" for their defense that the security interest failed as a result of non-notice to NASCAR. [Pl. Ex. 70].  In addition, Defendants Devine and DiSeveria only sought a Motion for Partial Summary Judgment in the Virginia Litigation without moving to dismiss to the entire lawsuit.  [Tr.

28

86:25-88:25; 85:4-89:4; Pl. Exs. 70, 78].  And despite Devine and DiSeveria's contention that the Bank's lien was invalid, Devine reached out to the Bank on his own in November 2017, and attempted to resolve the Bank's claims for $4 million.  [Pl. Ex. 34].  DiSeveria also acknowledged offering $250,000 of his own money during a settlement offer emailed to Front Row.  [Tr. 310:8-25; Pl. Ex. 36].  This demonstrates that Devine and DiSeveria knew there was potential liability, including for Plaintiffs, in the Bank's underlying lawsuit.

I.        Defendants' post trial brief devotes a significant portion to improperly re-arguing the merits of the Bank's security interest, most of which was not argued or presented at the bench trial.  [Doc. No. 74].  The Court will not re-litigate issues in the underlying Bank's lawsuit as those issues are not before this Court.  The Court also need not reach a conclusion on actual liability because, under North Carolina law, only a conclusion of potential liability is necessary.[8]  Courts around the country do not require an indemnitee to show actual liability in every case because it would "remove most of the incentive to settle."  Banc of Am. Merch. Servs., LLC, 2021 WL 2695474, at *9.   Indeed, "[t]he indemnitee would face an unpalatable choice: litigate the underlying claim to final judgment and then enforce the judgment against the indemnitor, or settle the claim and begin the deeply uncomfortable task of trying to prove liability against itself."  Id. (internal citations omitted); see also Kirkpatrick & Assocs., 280 S.E.2d at 636.

J.        As outlined in both Kirkpatrick & Assocs., Inc. and Banc of Am. Merch. Servs., LLC, where there is adequate notice to the indemnitor, "[a] settlement is presumed to be fair and reasonable, and the burden of showing a lack of good faith is upon the party asserting it." Kirkpatrick & Assocs., Inc., 280 S.E.2d at 636; Banc of Am. Merch. Servs., LLC, 2021 WL 2695474, at *9.  Since there has been no showing of a lack of good faith, then the settlement

---

[8] Defendants' counsel agreed on the record that Plaintiffs need only show potential liability rather than actual liability under North Carolina law.  [Tr. 17 at 10-11].

between Plaintiffs and the Bank is presumed to be fair and reasonable. Defendants have not rebutted that presumption.

K.    As the old saying goes, Plaintiffs were left "staring down the barrel" of the Bank's Motion for Summary Judgment and trial with little to no support from Devine and DiSeveria. As a result of facing costly litigation and the risk of potential liability, Plaintiffs entered into a good faith settlement with the Bank. [Tr. 28:5-29:20; 80:17-81:18; 325:20-23; Pl. Exs. 15, 61]. And repeatedly in the litigation, Plaintiffs invited Defendants to take over its defense. Defendants refused to do so. Plaintiffs invited Defendants to pay their attorneys' fees. Defendants refused to do so. Plaintiffs invited Defendants to settle the Bank's claims. Defendants made little attempt to do so. As recognized in Kirkpatrick & Assocs., Inc. and Banc of Am. Merch. Servs., LLC, because of Defendants' refusals and inaction, Plaintiffs were "entitled to make a good faith settlement" of the underlying claim because "the law encourages settlements." Kirkpatrick & Assocs., Inc., 280 S.E.2d at 636 (citing Wheeler, 175 S.E.2d at 772 and 12 Strong's N.C. Index 3d Torts 7.7 (1978)); Banc of Am. Merch. Servs., LLC, 2021 WL 2695474 at *9. The weight of the evidence presented at trial supports a conclusion that the settlement was made in good faith by Plaintiffs, who attempted to involve Defendants at every turn and, as discussed more in depth below, worked to arrive at a fair and reasonable settlement amount to resolve the Bank's claims. Defendants presented no convincing evidence of lack of good faith on the part of Plaintiffs in connection with the settlement, and the evidence does not support such a conclusion.[9]  Defendants also failed to

---

[9] Defendants attempted to conjure up some claims around lack of good faith by testifying that Jenkins said that he would not settle with the Bank without Defendants. As noted in the findings of fact, the Court did not find the testimony by Defendants credible on this issue where both Jenkins stated this was not the case, and the emails at the time demonstrated Plaintiffs continually and repeatedly involved Defendants and invited Defendants to take over the defense and/or participate in the settlement negotiations. [Tr. 258:1-12; 281:2-5; 301:9-302:20; Tr. 325:5-327:3; Pl. Exs. 44, 72, 75].

establish that any of their contended defenses applies. [Doc. No. 14 at 14-16 (enumerating affirmative defenses); Doc. Nos. 57, 74 (arguing defenses)].[10]

L.     It is also worth reiterating that Jenkins and Front Row negotiated that the Settlement Payment received by the Bank was paid towards BK Racing and Devine's outstanding loans owed to the Bank, ultimately benefiting Defendants, even though Defendants did not contribute to the Settlement Payment. [Pl. Exs. 18, 30]. It is undisputed that the Bank did, in fact, apply the entire Settlement Payment to the indebtedness it alleged was secured by CMA 33. [Tr. 185:2-8; 194:23-195:15; 196:8-22 (Walsh Dep. 55:2356:7), Pl. Exs. 60, 18 ¶ 2.]. This further demonstrates that Plaintiffs acted in good faith, going as far to ensure Defendants also reaped the full benefit of the settlement with the Bank.

M.     Even setting aside the presumption, the Court concludes that Plaintiffs' settlement with the Bank by paying $2.1 million to resolve the claims was fair and reasonable based on the evidence presented at trial. Under North Carolina law, "reasonableness" is generally a question of fact reserved for the finder of fact. Fortson v. Garrison Prop. And Cas. Ins. Co., No. 1:19-CV-294, 2022 WL 198782, at *10 n.9 (M.D.N.C. Jan. 13, 2022); Bader v. Roberts & Stevens, P.A., No. 1:16-CV-00294-GCM-DSC, 2018 WL 4760500, at *3 (W.D.N.C. Oct. 2, 2018), aff'd sub nom. Bader v. Kurdys, 767 F. App'x 516 (4th Cir. 2019).

N.     In the Virginia Lawsuit, the Bank requested not less than $2.75 million trebled to $8.25 million pursuant to Va. Code § 18.2-500(A), punitive damages in the amount of $350,000.00, and the Bank's costs and reasonable attorneys' fees under the Security Agreement and under

---

[10] The Court notes that certain of Defendants' claimed defenses were already rejected by this Court at summary judgment. [Doc. No. 56].

Virginia law.[11]  [Def. Ex. AA].  Plaintiffs also faced the risk of losing their substantial investment in CMA 33 as a result of the litigation with the Bank.  [Tr. 73:9-25; Tr. 80:18-90:7; Tr. 97:21-98:6]. Plaintiffs' decision to settle the Bank's claim for a fraction of the potential liability faced by Plaintiffs is within the range of what other courts have decided was fair and reasonable.  See Ames v. Cont'l Cas. Co., 340 S.E.2d 479, 485 (N.C. Ct. App. 1986) ($5,250,000 settlement payment was reasonable compared to $11,600,000 in potential liability (i.e. settlement was 45% of potential total liability)); Valloric v. Dravo Corp., 357 S.E.2d 207, 214 (W. Va. 1987) ($105,000 settlement was reasonable compared to $150,000 in potential total liability (70%)); Chevron Oronite Co., L.L.C. v. Jacobs Field Servs. N. Am., Inc., 951 F.3d 219, 236 (5th Cir. 2020) ($550,000 settlement was reasonable compared to $790,000 in potential total liability (70%)); Home Indem. Co. v. Holmes Org., 131 F. Supp. 2d 1238, 1258-59 (N.D. Okla. 2000) ($7,500,000 settlement was reasonable compared to $86,000,000 in potential total liability (9%)).  Accordingly, this Court also concludes that the $2.1 million settlement was fair and reasonable.[12]

O.     It was also reasonable for Plaintiffs to settle in early March 2022 before Plaintiffs incurred additional significant costs and attorneys' fees required to prepare for and litigate a summary judgment hearing and trial.

P.     Moreover, four years earlier in February 2018, Devine proposed paying the Bank $2.75 million to settle the Bank's lien claim against CMA 33.  [Pl. Ex. 44].  Then again, in on

---

[11] Plaintiffs cite potential exposure figures that are even higher.  [Doc. Nos. 57, 70].  However, for the purposes of evaluating the settlement, the Court has taken the more conservative exposure figures into consideration as claimed in the Bank's First Amended Complaint.  [Def. Ex. AA].

[12] Defendants have tried to argue that the $2.1 million payment between "Lien Claims" and "Other Claims," with only one dollar assigned to the latter category undermines good faith and the reasonableness and fairness of the settlement. This argument is without merit.  The irony of Defendants' argument is that the settlement structure ultimately benefited Defendants so that the settlement funds could be applied to the outstanding loans balances by BK Racing and Devine. [Tr. 127:13-20; 185:2-8; 194:23-195:15; 196:8-22 (Walsh Dep. 54:13-19).].  In addition, the Court further concludes that these arguments fail in light of the above discussed presumption and, irrespective of that presumption, that the settlement was fair and reasonable based on the weight of the evidence at trial and the caselaw cited herein.

November 1, 2017, Devine sent a letter to Michael Walsh at the Bank offering to pay the sum of $4 million cash to the Bank:

> in exchange for [the Bank] delivering to [BK Racing] all assets of [BK Racing] in which [the Bank] claims a security interest free and clear of all security interests. More specifically these [BK Racing] assets include both NASCAR charters #32 and #33 . . . as set forth in various security agreements and UCC Financing statements that have been recorded by [the Bank].

[Pl. Ex. 34]. And DiSeveria acknowledged offering $250,000 of his own money during a settlement offer emailed to Front Row. [Tr. 310:8-25; Pl. Ex. 36]. If it was fair and reasonable for Defendants to settle the Bank's claim for these amounts, then it was also fair and reasonable for Plaintiffs to settle the Bank's claims for $2.1 million in March 2022.

## V. ORDER

**FOR THE FOREGOING REASONS**, the Court enters the following Order:

1. Plaintiffs **FRONT ROW MOTORSPORTS, INC.** and **ROBERT A. JENKINS** shall recover on their breach of contract claim against Defendants **MICHAEL DISEVERIA** and **RONALD C. DEVINE** jointly and severally in the amount of $2,100,00.00, plus pre-judgment interest and post-judgment interest. Concerning pre-judgment interest, within ten days of this Order, Plaintiff shall file a calculation of pre-judgment interest from April 1, 2022, the date the Complaint was filed, through the date of this Order, and shall also state the per diem amount of pre-judgment interest.

2. The Clerk of Court is instructed to enter Judgment in accordance with this decision, with interest thereafter running at the lawful federal judgment rate.

3. Within 21 days of entry of the Judgment, Plaintiffs shall file:

    a. a brief no more than 12 pages and affidavit in further support of its request for $412,397.48 in attorneys' fees and costs related to the

defense and response required and arising out of and in connection with the Disposition Notice, North Carolina Lawsuit and Virginia Lawsuit;[13] and

b.  a separate brief no more than 12 pages on Plaintiffs' request for attorneys' fees and costs incurred in this action along with a supporting affidavit.

Within 14 days after receipt of Plaintiffs' briefs, Defendants may file responsive briefs no more than 12 pages each on the respective requests.

4.      The Clerk is further directed to send copies of this Order to the parties' counsel.

**SO ORDERED**.

Signed: December 12, 2023

Susan C. Rodriguez
United States Magistrate Judge

---

[13] The Court recognizes that Plaintiffs and Defendants partially addressed attorneys' fees in post-trial briefing, but full briefing on this issue is needed before the Court renders a decision.